IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| ILYANA ILIEVA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. _____ |
| ) | **Jury Trial Demand** |
| BELMONT UNIVERSITY and ) | |
| RYAN SPLITTGERBER, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Ilyana Ilieva brings this action against Defendant Belmont University and Defendant Ryan Splittgerber for violations of the American with Disabilities Act under federal law, and Defendant Belmont University for breach of express or implied or quasi-contract and negligence, and Defendant Ryan Splittgerber for battery under state law under pursuant to supplemental jurisdiction.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the federal law claims, the Americans with Disabilities Act, pursuant to 28 U.S.C. §1331.

2. The Court has jurisdiction over the state law claims, breach of express and implied contract, negligence, and battery, pursuant to 28 U.S.C. §1367. Supplemental jurisdiction is appropriate because:

   a. This Court has original jurisdiction over the federal law claims.

1

b. The state law claims are so interrelated to the claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.

c. There is a common nucleus of operative facts by and between the federal and state law claims.

d. The state law claims raise no novel or complex issues of state law.

e. The state law claims do not substantially predominate over the federal law claims.

f. There is no exceptional circumstance under Section 1367 and no other compelling reason for declining supplemental jurisdiction.

3. Pursuant to 28 U.S.C. §1391 (1) and (2), venue is proper in this federal district court because it where a substantial part of the events or omissions giving rise to the claims occurred or where all the Defendants reside.

## PARTIES

4. Plaintiff Ilyana Ilieva is a citizen of the United States and resides in Nashville, Tennessee.

5. Belmont University (sometimes "Belmont") is made a Defendant herein. Belmont has a medical school named the "Thomas F. Frist, Jr. College of Medicine" (sometimes "College of Medicine"). Belmont may be served via its registered agent, Jason Rogers, 1900 Belmont Blvd., Nashville, Tennessee 37212.

2

6. Ryan Splittgerber is made a Defendant herein. Splittgerber is a Professor of Anatomy at the College of Medicine and may be served at 7269 Old Franklin Rd., Fairview, Tennessee 37062.

**FACTUAL AVERMENTS**

7. In 2018, Plaintiff earned her undergraduate degree from Belmont University. Her grade point average in her major was 4.00. In 2021, she then earned a Master's Degree (MBE) in Bioethics from The University of Pennsylvania.

8. Sometime thereafter, Plaintiff applied for and was admitted to medical school at Belmont University's College of Medicine.

9. After being admitted to Defendant Belmont's Thomas F. Frist, Jr. College of Medicine, Plaintiff was enrolled as a medical student for the inaugural class for the College of Medicine.

10. Plaintiff has been diagnosed with and suffers from the following disabilities: General Anxiety Disorder; Cyclic Vomiting Syndrome; Colitis; and Enteritis.

11. These disabilities affect her major life activities, including but not limited to focusing in class and otherwise at the College of Medicine, walking to attend classes and other functions, participating in classes, labs, practicums, clinical assessments, and taking tests and exams.

12. During her first months as a student at the College of Medicine, Plaintiff became sick repeatedly and went to Vanderbilt Clinic or hospital at least six times. Her illnesses resulted or were caused by her disabilities.

13. Plaintiff's illnesses, brought about by her disabilities, continued to flare up during the first months of her first medical school year. Plaintiff was unable to attend and missed numerous classes, lectures, labs, practicums, medical school functions, and also missed taking tests and exams. Plaintiff promptly communicated her absences generally in advance to College of Medicine officials (Dr. Cernak, house leader, and Dr. Lewis, Assistant Dean) about each medical visit and each appointment to physicians or her other health care providers.

14. Plaintiff also told numerous other officials at the College of Medicine about having to miss classes, labs, tests, exams, labs and practicums due to her disabilities. Dr. Ruth Stewart and the Office of Medical Education would then reschedule them but acted hostile toward Plaintiff.

15. Due to her personal medical issues and disabilities, which caused her to miss classes, tests and otherwise, Plaintiff fell behind in her studies.

16. At or near that time, Plaintiff's personal physician advised due to her acute medical issues, caused by her disabilities, that she should have a flexible testing schedule and a testing strategy with flexible dates for taking tests and completing assignments and other accommodations.

17. As provided by law and by Belmont and the College of Medicine's policies and procedures, Plaintiff requested reasonable accommodations. Plaintiff provided comprehensive medical records to and met with the Office of Accessibility Services at Belmont. She completed all forms and information required by Belmont to request and receive accommodations.

4

18. Plaintiff then requested two reasonable accommodations: first, reduced distractions environment for tests and exams (in November 2024); and second, a flexible exam schedule that would allow her to take tests or exams within seven days of the scheduled test or exam (in January 2025).

19. Defendant Belmont University Office of Accessibility approved both accommodations, communicating with Plaintiff that they were reasonable accommodations.

20. Defendant Belmont University Office of Accessibility then emailed the College of Medicine's Office of Medical Education about the accommodations.

21. The College of Medicine Office of Medical Education approved the first reasonable accommodation – reduced distraction environment on December 2024) – but contrary to the Belmont University Office of Medical Education, <u>denied</u> the second reasonable accommodation – flexible testing schedule on February 19, 2025.

21a. After the first accommodation was granted, her scores on tests and exams improved but she would have performed better and remained in the program if the second accommodation also had been approved. However, the first accommodation was not consistently provided through and including March 2025.

22. After the denial of the second reasonable accommodation, Plaintiff met with Holly Randa, the Director of Assessment and Evaluation in the College of Medicine's Office of Medical Education.

23. The denial of the second accommodation was upheld. Though Belmont University had approved the accommodation, Randa stated that the College of

5

Medicine made the decision to deny the second accommodation, wrongly claiming it was an "undue burden."

24. Other students at the College of Medicine, however, frequently were granted more flexibility and permitted to make up exams and tests after the scheduled exam or test was given, and at times more than seven days after the date of the scheduled exam or test.

25. Without the second reasonable accommodation – flexible testing schedule, Plaintiff did not do as well as she could have in successfully or adequately completing the requirements for her medical school studies.

26. In October or November 2024, the College of Medicine became aware of and knew about Plaintiff's disabilities, medical conditions, missing classes and other requirements. Her issues were then given to the College of Medicine "Student Assessment and Promotions Committee" ("SAPC").

27. SAPC held a hearing and recommended that she restart medical school the following year. Plaintiff timely appealed that decision. Dr. Stewart, who was tasked with rescheduling classes, exams, and tests for Plaintiff sabotaged Plaintiff, often not rescheduling, yelling at Plaintiff, directing her not to appeal the SAPC decision and undercutting her efforts to remain in the College of Medicine.

28. Thereafter, an *ad hoc* committee was formed to review the SAPC recommendation.

29. Defendant Ryan Splittgerber was appointed to the *ad hoc* committee, privately told Plaintiff she should not disclose that he was a part of the committee,

and that he would ensure that she could stay in school, and further would help her catch up, and be successful as a medical student.

30. On December 1, 2024, the ad hoc committee overturned the SAPC recommendation, and the Dean approved such.

31. At or near that time, Defendant Ryan Splittgerber began inappropriately touching Plaintiff.

32. Repeatedly, Defendant Splittgerber would place his hand on her legs, lower and upper back, hips, shoulders, neck and ear, and would press his arm and body against her breasts. Often, he would rub his face against her face and cheeks and touch her shoes with his shoes.

33. In anatomy lab, Defendant Splittgerber was the professor in charge of that class. In that class, he pressed his erect penis against Plaintiff's body. Defendant asked Plaintiff to travel to Memphis with him to watch his child's soccer game.

34. Defendant Splittgerber's unwanted advances and touching bothered and greatly troubled Plaintiff. These unwanted sexual advances greatly disturbed Plaintiff and she felt violated. Plaintiff never consented to the touching or advances.

35. Certain faculty members noticed that Defendant Splittgerber was spending much time alone with Plaintiff.

36. To allay or avoid suspicion, to attempt to avoid others seeing his spending time with Plaintiff, and to keep Plaintiff in close proximity to him, Defendant Splittgerber would do the following:

(a) schedule meetings in early morning with Plaintiff when other faculty members, staff or students were unlikely to be present;

(b) meet with Plaintiff in his private windowless office with the door closed and touch and press against her without others knowing (he had two offices);

(c) under the guise of helping Plaintiff, offer private tutoring sessions so she could do well at the College of Medicine, all the while continuing to inappropriately touch her and make unwanted advances; and

(d) tell her that he would ensure that she could stay in school.

37. Defendant Splittgerber was in position of authority over Plaintiff and told her or led her to believe that he could keep her in good standing at the College of Medicine and that she could remain a student at the College of Medicine.

38. Defendant Splittgerber told Plaintiff not to tell anyone about his inappropriate actions toward her and that she was overthinking.

39. On February 25, 2025, the College of Medicine sent an email with an attached letter dismissing Plaintiff from the College of Medicine.

40. Plaintiff showed Defendant Splittgerber the letter dismissing her from the College of Medicine.

41. On that same day, Defendant Splittgerber then told Plaintiff that he would start talking to faculty and reverse the dismissal.

42. The next day, Defendant Splittgerber told Plaintiff that he had not talked to faculty and his attitude made it clear that he would not do so.

43. Plaintiff appealed the decision within the five (5) day time limit set by the College of Medicine.

44. On March 14, 2025, Plaintiff was informed that her appeal was denied and the dismissal from the College of Medicine was upheld.

44a. The ADA violations continued up to and prior to her dismissal.

45. Belmont published the "Bruin Guide" for the 2024-2025 academic year, and the College of Medicine published a "Student Handbook" for that academic year, which was the year that Plaintiff was accepted and began her studies (2024-2025).

46. Notwithstanding disclaimers, the Bruin Guide and Student Handbook constitutes express or implied contracts for students attending the University and/or College of Medicine.

47. The Student Handbook, at page 8, explicitly states that Belmont "uphold[s] Christian standards of morality, ethics, and conduct," "holds high expectations of each person who chooses to join the community," and complies with "federal law" and the "Americans with Disabilities Act" (hereinafter sometimes "ADA"). The College of Medicine does not discriminate on the basis of disability or sex "in the administration of education policies, programs, activities …"

48. The Bruin Guide, at page 111, states that Belmont does not discriminate on the basis of disability or sex in the "administration of education policies, programs, activities …" Belmont follows the Americans With Disabilities Act and federal law regarding "sexual harassment."

9

49. The Student Handbook, at page 123, states that medical students are not "expected to tolerate inappropriate sexual behavior on the part of the faculty…" Moreover, the College of Medicine prohibits "[u]nwelcome sexual contact by faculty," and "unwelcome touching."

50. The Student Handbook, at page 122, states that any "physical conduct" that "humiliates," "harasses," or "degrades" another person "will not be tolerated" in the College of Medicine. A listed example is "unwanted physical conduct."

51. In addition, the "expressed or implied consent of the victim is not a defense."

52. The Student Handbook, at page 108, states as follows: "If the temporary impairment cannot be mitigated with reasonable accommodations, the Associate Dean for Student Affairs & Diversity will counsel the student regarding the option to take a leave of absence." The Associate Dean did not counsel Plaintiff.

53. Plaintiff advised Professors at the College of Medicine and filed a complaint with the Office of Civil Rights.

## INJURIES, HARM AND LOSSES TO PLAINTIFF

54. Defendant Belmont's acts, inaction, breaches and violations of the law legally and proximately caused injury, harm, loss and damage to Plaintiff.

## VIOLATIONS OF LAW
## COUNT 1: BREACH OF CONTRACT

55. The preceding paragraphs are restated as if fully repeated.

56. The Student Handbook and Bruin Guide for academic year 2024-2025 set forth policies and procedures for Belmont and the College of Medicine to follow;

10

they are contracts between Belmont and the Students entering in a particular academic year.

57. Plaintiff was accepted into and began attending Belmont's College of Medicine in the 2024-2025 academic year.

58. By contract as set forth above, Belmont agreed not to discriminate against Plaintiff on the basis of disability.

59. Belmont and the College of Medicine discriminated against her on the basis of her disability and breached the contract.

60. By contract as set forth above agreed to uphold and not violate the Americans with Disabilities Act. Belmont failed to do so and breached the contract.

61. By contract as set forth above, Belmont, by its representative, employee or agent, Ruth Steward, discriminated against Plaintiff by sabotaging her schedule and treating her differently from other similarly situated students when she was suffering from disabilities.

62. Belmont thus breached its contract or agreement with Plaintiff.

63. Belmont agreed to provide Plaintiff with the first requested accommodation: reduced distraction; however, frequently and up to and including March 2025, Belmont often failed to do so.

64. By contract as set forth above, Belmont agreed not to discriminate against Plaintiff on the basis of sex and not permit sexual harassment or unwanted touching. A Belmont faculty member, Defendant Splittgerber, sexually harassed her, touched her inappropriately and his touches were unwanted.

11

65. Belmont failed to provide Plaintiff's second requested reasonable accommodations – flexible testing and discriminated against her on the basis of her disability.

66. With flexible testing, Plaintiff would have performed better in school.

67. Belmont thus breached its contract.

68. By contract as set forth above, Belmont was supposed to offer counseling or counsel Plaintiff after Belmont denied her second accommodation.

69. Belmont thus breached its contract.

70. Belmont violated the covenant of good faith and fair dealing.

71. Belmont breached its contract with Plaintiff.

72. As a direct result of the breach or breaches, Plaintiff sustained direct and other consequential or incidental damages, including dismissal from the College of Medicine, monetary losses, emotional injuries, and practically the inability to enroll in another medical school.

### COUNT II – QUASI CONTRACT OR CONTRACT IMPLIED BY LAW (ALTERNATIVE TO COUNT I)

73. The preceding paragraphs are restated as if fully repeated.

74. This Count II is pled in the alternative to Count I.

75. Were the Court to conclude that there is no existing, enforceable contract between the parties regarding the matters and subject set forth herein, then the law provides a remedy – quasi-contract or contract implied by law.

76. Plaintiff paid fees to Defendant Belmont and expended funds to attend Belmont's College of Medicine and Plaintiff attended the College of Medicine.

77. Defendant Belmont received fees from Plaintiff.

78. The circumstances indicate that the parties to the transactions should have reasonably understood that Plaintiff expected Defendant Belmont to honor its promises and commitment.

79. The circumstances demonstrate that it would be unjust for a party to retain the fees and not honor its commitments to Plaintiff and the Court should find that there was a contract between the parties or find that there was a quasi-contract between the parties.

**COUNT III – AMERICANS WITH DISABILITIES ACT**

80. The preceding paragraphs are restated as if fully repeated.

81. Plaintiff brings this Count under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (hereinafter "ADA") and particularly Title II thereof.

82. Plaintiff is a person with a disability. 42 U.S.C. § 12102.

83. Plaintiff has an impairment or impairments that substantially limit one or more major life activity, or has a record of such an impairment or is regarded as having an impairment or disability. 42 U.S.C. § 12102.

84. Plaintiff is a qualified individual with a disability.

85. Defendant Belmont is a private entity under the ADA, 42 U.S.C. § 12181 (7)(J) and is subject to Title II of the ADA.

86. The ADA bars educational discrimination against "qualified individuals with disabilities." The ADA prohibits Defendant Belmont from discriminating against persons with disabilities. 42 U.S.C. § 12182.

87. Title II of the ADA applies specifically to educational institutions, including Belmont and requires Belmont to make educational opportunities, extracurricular activities, and facilities open and accessible to all students. The ADA applies to private sector institutions, including Belmont.

88. Plaintiff had meetings with officials at Belmont about these issues.

89. Although Belmont granted one accommodation, reduced distractions, Belmont was inconsistent in granting it and failed to grant it consistently and failed to grant from about late 2024 until March 2025. This was a continuing violation of the ADA.

90. Belmont failed to grant a second reasonable accommodation – flexible testing – and violated the ADA. This failure constituted a continuing violation of the ADA.

91. Defendant Belmont discriminated against Plaintiff in violation of the ADA and violated the ADA.

92. As a result of Belmont's discrimination and/or failure to accommodate Plaintiff or its policies or procedures that negatively affect a person with a disability, Plaintiff sustained injury and losses.

## COUNT IV: BATTERY

93. The preceding paragraphs are restated as if fully repeated.

94. Defendant Splittgerber committed the tort of battery.

95. Defendant Ryan Splittgerber began inappropriately touching Plaintiff in late 2024 and continued until and including March 2025.

96. Repeatedly, Defendant Splittgerber with his hand touched Plaintiff's on her legs, lower and upper back, hips, shoulders, neck and ear. At times, he would press his arm and body against her breasts. Often, he would rub his face against her face and touch her shoes with his shoes. Plaintiff did not want to be touched or have any physical contact with this Defendant.

97. In anatomy lab, Defendant Splittgerber was the professor in charge of that class. In that class, he pressed his erect penis against Plaintiff's body.

98. This unwanted touching occurred at Belmont College of Medicine.

99. Defendant Splittgerber's unwanted advances and touching bothered and greatly troubled Plaintiff. These unwanted sexual advances and touching greatly disturbed Plaintiff and she felt violated.

100. Defendant Splittgerber intentionally, unlawfully, and offensively made physical contact with Plaintiff.

101. Defendant Splittgerber intended to do the act and acts that caused the harm.

102. Plaintiff was injured and damaged by these acts.

103. Defendant Splittgerber committed the tort of battery against Plaintiff.

**COUNT V: NEGLIGENCE AGAINST DEFENDANT BELMONT**

104. The preceding paragraphs are restated as if fully repeated.

105. Belmont College of Medicine knew or should have known that Defendant Splittgerber had a record at other school or schools of inappropriately touching female students or sexual harassment.

106. Belmont had a duty to determine Splittgerber's past record in that regard and hired and retained him.

107. The College of Medicine failed to adequately supervise Splittgerber.

108. Given the facts and circumstances, it was foreseeable that Splittgerber would or could take unfair advantage of female students including Plaintiff.

109. The College of Medicine provided Splittgerber with a private windowless office.

110. Certain faculty or staff knew or witnessed Plaintiff being alone at odd times with Splittgerber.

111. The College of Medicine was negligent in hiring or in failing to supervise Splittgerber.

112. The College of Medicine's failure to do so breached the duty owed to Plaintiff.

113. Defendant Belmont's negligence proximately caused injury and harm to Plaintiff.

## DAMAGES

114. As a result of Plaintiff Belmont's violations of law, violations of the ADA, breach of contract, and negligence, or otherwise, Plaintiff suffered actual damages, including incidental and consequential damages, and not limited to wrongfully dismissing her from the College of Medicine, costs incurred in attending the College of Medicine, loss of a full scholarship, lost economic opportunities, and loss of future income.

115. Plaintiff demands compensatory damages from Belmont in the amount of $1,000,000. For the ADA violations, Plaintiff only seeks the maximum amount set by statute and attorney's fees.

116. As a result of Plaintiff Splittgerber's acts and conduct, Plaintiff suffered damages and demands judgment of $1,500,000 for compensatory damages.

117. Plaintiff Splittgerber acted in reckless disregard of Plaintiff's rights; his conduct was reprehensible, he was indifferent to the harms that he caused her, his actions were repeated, he used his position as a professor with authority over her to make sexual advances and unwanted touches, his sexual harassment occurred over months; and he wrongly and falsely assured her that she would remain in medical school.

118. Plaintiff demands that punitive damages be assessed and in addition to compensatory damages that a judgment for punitive damages in the amount of $3,000,000 be awarded to Plaintiff against Defendant Splittgerber.

## INJUNCTIVE RELIEF

119. Belmont's acts, omissions or practices continue to harm and injure Plaintiff: she was dismissed from the College of Medicine and is unable to continue her medical school studies.

120. Plaintiff seeks an injunction that Belmont reinstate her as a student in good standing in the College of Medicine and reinstate her full scholarship and order Defendant Belmont not to retaliate against Plaintiff.

## JURY TRIAL DEMANDED

121. Plaintiff demands a trial by jury to decide all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for the following relief:

1. That process issue and that Defendant be served.

2. That Plaintiff have all rights and benefits set forth in discovery and law in pursuing this action.

3. That a jury be empaneled to hear and decide all issues triable by a jury.

4. That the court or jury find that Defendant Belmont violated the ADA and breached the contract with Plaintiff or that a quasi-contract existed between the parties; and that Defendant Belmont was negligent in hiring or failing to supervise Defendant Splittgerber.

5. That a jury award Plaintiff compensatory damages of $1,000,000 against Belmont for all violations of law.

6. That Belmont be ordered to readmit and reinstate Plaintiff to the College of Medicine as a medical student in good standing and reinstate and provide her the full scholarship provided by the College of Medicine.

7. That the jury award Plaintiff compensatory damages of $1,500,000 against Defendant Splittgerber and an additional $3,000,000 in punitive damages against Defendant Splittgerber.

8. That a reasonable attorney's fee be awarded under the American with Disabilities Act.

9. That costs be taxed to Defendants.

10. That the Court grant injunctive relief whether *pendente lite* and/or after trial, as set forth herein or otherwise necessary under the facts of this case.

11. For such other and further relief as the case demands and justice requires.

        Respectfully submitted,

        /s/Perry A. Craft
        Perry A. Craft, BPR # 006056
        LAW OFFICE OF PERRY A. CRAFT, PLLC
        402 BNA Drive, Suite 402
        Nashville, Tennessee 37217
        Telephone (615) 953-3808
        Facsimile: (615) 739-6292
        Email: perrycraft@craftlegal.com